**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| JAMES BERRY | * | |
| Plaintiff | * | |
| v. | * | Civil Action No. CCB-14-3145 |
| DPSCS SEC. GREGG L. HERSHBERGER, *et al.* | * | |
| Defendants | * | |

***

# **MEMORANDUM**

Pending in the above-entitled civil rights action is defendants' motion to dismiss or for summary judgment, (ECF No. 23), which is opposed by plaintiff, (ECF No. 25). Also pending is plaintiff's motion for appointment of counsel. (ECF No. 3). The court finds a hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2014).

In his motion for appointment of counsel, plaintiff asserts he is unable to afford counsel, he is incompetent, and all pleadings filed were prepared by another inmate who avers he will no longer be able to assist plaintiff if or when he is moved from plaintiff's housing unit.[1] (ECF No. 3.) A federal district court judge's power to appoint counsel under 28 U.S.C. § 1915(e)(1) is discretionary, and may be considered where an indigent claimant presents exceptional circumstances. *See, e.g.*, *Cook v. Bounds*, 518 F.2d 779, 780 (4th Cir. 1975). Upon careful consideration of the motions and previous filings by plaintiff, the court finds that he has demonstrated the wherewithal either to articulate the legal and factual basis of his claims himself or to secure meaningful assistance in doing so. No hearing is necessary to the disposition of this case, and plaintiff has filed an opposition to the dispositive motion. There are no exceptional

---

[1] The court notes that following the motion for appointment of counsel, plaintiff filed an opposition response to the dispositive motion filed by defendants. Thus, it appears he is either still receiving assistance or has managed to proceed on his own.

circumstances that would warrant the appointment of an attorney to represent plaintiff under § 1915(e)(1) and the motion for appointment of counsel shall be denied.

## Background

Plaintiff, a pre-trial detainee, was transferred to Roxbury Correctional Institution ("RCI"), located in Hagerstown, Maryland, from the Baltimore City Detention Center ("BCDC") on May 10, 2013. Plaintiff asserts the transfer occurred without legitimate security reasons to justify it. He claims the transfer "over 200 miles from the court" where he is being prosecuted has hindered his ability to meet with his attorney and assist in the preparation of his defense. (ECF No. 1 at 6.) Plaintiff claims that at BCDC there was a private visiting booth where he could meet with his attorney as well as a secure phone line. (*Id*.) He further alleges that his assigned case manager at RCI told him that the State's Attorney assigned to his case in Baltimore City told RCI staff not to allow plaintiff a secure line or private visits with his attorney; that all encounters with his attorney would be recorded; and that his mail would be monitored for incriminating evidence that could be used in his prosecution. (*Id*. at 7.) Plaintiff claims that his case manager further advised that he would not have any privacy and that the case manager would testify against plaintiff in his criminal trial with any incriminating information he overheard. (*Id*.)

Plaintiff alleges that on May 5, 2014, Warden J. Michael Stouffer ordered Lt. Camford to search his cell. (*Id.* at 8.) At the time, plaintiff occupied a single cell in RCI's special management unit. Officers Trumpower, Thomas, Scott, and Short arrived at plaintiff's cell, handcuffed him, and told him his cell would be searched. Plaintiff claims the door to his cell was opened before he was handcuffed. Trumpower, who became impatient with the time it took plaintiff to put pants on, came into the cell, pushed plaintiff against the wall, and put handcuffs

on plaintiff.  When plaintiff commented that "all this was unnecessary," he alleges that Trumpower threatened to use pepper spray on him.  (*Id.* at 8.)  Plaintiff claims that Trumpower dragged plaintiff backwards by holding onto the chain in the middle of the handcuffs and, using his other hand to hold onto plaintiff's arm, Trumpower threw plaintiff against the cell wall and slammed him into the cell door.  As a result, plaintiff claims his right shoulder and both wrists were injured.  (*Id.* at 9.)

Officers Thomas, Scott, and Short went into plaintiff's cell and began throwing his property, including legal papers, around the cell.  (*Id.* at 9.)  Plaintiff asserts that Thomas, Scott, and Short also witnessed Trumpower's assault on him, but failed to do anything about it or report it to their supervisors.  Plaintiff claims that Trumpower repeatedly placed him in an "upper shoulder lock" and was antagonizing and taunting plaintiff while his cell was searched.  (*Id.*)  During the search, plaintiff claims that he was asked where his mail was, but as he began to speak Trumpower told him to shut up and jerked on the handcuffs so hard it made plaintiff "yelp[]."  (*Id.*)  Plaintiff claims that Thomas asked Trumpower why he was "doing this" to plaintiff since plaintiff was asked to assist in locating his mail.  Thomas then asked Trumpower to leave because he was antagonizing plaintiff.  Trumpower left and the mail was located in plaintiff's cell.  Plaintiff states he asked to speak with Lt. Appel because he wanted to understand what was being done with his mail and the notes he was preparing to assist in his defense.  Plaintiff alleges that his family's personal information was contained in the mail and, in the past, information regarding his family had been leaked and people "were murdered due to legal problems."  (*Id.* at 10.)

After returning to his cell following the search, plaintiff states he noticed his back was "burning" and that he was bleeding as a result of the force used against him by Trumpower.  (*Id.*)

He asked to report the assault and to be seen by medical staff for two hours before an inmate sanitation worker on the tier asked a correctional officer to assist plaintiff.  Officer Thomas reported to plaintiff's cell and he was taken to medical a short time later.[2]  (*Id*. at 11.)   Plaintiff told Lt. Appel that he wanted to press criminal charges against the officers who searched his cell for unnecessary use of force, assault, and destruction and theft of property.  He claims, however, he has not been interviewed by a detective for purposes of pursuing those charges.  (*Id*. at 12.)

Plaintiff claims that after reporting the assault he was targeted for retaliation by correctional staff through deprivation of showers and attorney calls and his family is harassed during visits.  (*Id.*)  On September 25, 2014, plaintiff was transferred to "a more harsh and secure prison" without explanation or prior hearing.  (*Id.*)  Plaintiff asserts that his transfer to Western Correctional Institution ("WCI") in Cumberland, Maryland has hindered his ability to see his attorney to aid the preparation of his defense.  (*Id*. at 13.)  He further claims that while he was incarcerated at RCI, his attorney was denied entry to see him on numerous occasions and that he was denied access to the law library.  (*Id*.)

In addition to the alleged assault and difficulties with legal visits, plaintiff alleges that he was denied his right to practice his chosen religion while he was confined at RCI.  (*Id.*)  He claims he asked Chaplain Kitchen on July 20, 2013, to place his name on the Ramadan fast list so that he could receive his meals during non-daylight hours.  Plaintiff claims that Kitchen told him he could not participate in Ramadan because of his pre-trial status.  Additionally, plaintiff claims Kitchen told him he could not order any religious articles such as a prayer rug, because of his pre-trial status.  Plaintiff asserts he was denied participation in Ramadan during 2013 and 2014.  (*Id.* at 13-14.)  As relief, plaintiff seeks an order requiring his transfer back to BCDC and

---

[2]  Plaintiff claims there was some confusion as to whether he would be permitted to visit with his family who were there to see him before being taken to medical. (*Id.* at 11.)

monetary damages.  (*Id*. at 16-17.)

Defendants deny plaintiff's allegation that they threatened, harassed, or assaulted him. (ECF No. 23 Exs. 1-4.)  They claim plaintiff became agitated during the search of his cell and re-entered the cell, requiring his removal by Trumpower and Thomas using a "hands on escort." (ECF No. 23 Ex. 1 at 2.)  They further assert that the medical reports support their claim that excessive force was not used as the only documented injury to plaintiff was a three-inch scratch. (ECF No. 23 Ex. 6 at 12-18.)

With regard to plaintiff's claim of retaliation, defendants provide segregation assignment sheets from April through September, which demonstrate that plaintiff had regular access to showers and recreation.  (*Id.* at 5-10.)  Additionally, defendants assert plaintiff's claims regarding denial of visits with his attorney were dismissed in the administrative remedy process because he had two visits from his attorneys two days before the complaint was filed.  (*Id*. at 78.)

Defendant Kitchen, the Chaplain at RCI, states he does not recall plaintiff's request to participate in Ramadan 2014, but in 2013 plaintiff was not registered as a Muslim and this was the reason he was not allowed to participate.  (ECF No. 23 Ex. 5.)  Kitchen further states that there was no indication in plaintiff's file regarding his religious preference and his request for participation was shortly before Ramadan commenced.  (*Id*.)  In order to participate in Ramadan, an inmate must have completed a religious preference card designating an appropriate religious orientation at least 30 days before Ramadan commences.  (*Id*.)  Kitchen asserts that when plaintiff was informed he needed to submit the appropriate paperwork, he became belligerent and refused to do so.  (*Id*.)  With regard to plaintiff's requests to acquire religious articles such as a prayer rug, Kitchen states that under "DPSCS Religious Services Manual 140.001, Section VI J, an inmate may possess approved religious property items for the religion for which they are

registered in quantities authorized in allowable inmate property directives." (*Id*. at 2.) Thus, defendants assert plaintiff was not permitted to participate in Ramadan or order religious articles because of his refusal to register a religious preference. (*Id.*)

## Standard of Review

The defendants have moved to dismiss Berry's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56. A court considers only the pleadings when deciding a Rule 12(b)(6) motion. Where, as here, the parties present materials outside of the pleadings and the court considers those materials, the motion is treated as one for summary judgment under Federal Rule of Civil Procedure 12(d). "There are two requirements for a proper Rule 12(d) conversion." *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013) (en banc). First, all parties must "be given some indication by the court that it is treating the 12(b)(6) motion as a motion for summary judgment," which may be satisfied when a party is "aware that material outside the pleadings is before the court." *Id.* (quoting *Gay v. Wall,* 761 F.2d 175, 177 (4th Cir. 1985)). "[T]he second requirement for proper conversion of a Rule 12(b)(6) motion is that the parties first 'be afforded a reasonable opportunity for discovery.'" *Id.* (quoting *Gay*, 761 F.2d at 177).

Here, Berry had adequate notice that the defendants' motion might be treated as one for summary judgment. The motion's alternative caption and attached materials in themselves put Berry on notice. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir. 1998). Moreover, the court explained in a letter to Berry that the motion was either to dismiss or, in the alternative, for summary judgment. (ECF No. 24.) If Berry believed he needed additional evidence to oppose summary judgment, Rule 56(d) afforded him the opportunity to

seek further discovery through an affidavit. *See* Fed. R. Civ. P. 56(d); *see also Greater Balt.*, 721 F.3d at 281 ("[The defendant] took 'the proper course' when it filed the Rule 56([d]) Affidavit, 'stating that it could not properly oppose . . . summary judgment without a chance to conduct discovery.'") (citation omitted); *Laughlin*, 149 F.3d at 261 (refusing to overturn district court's grant of summary judgment on assertions of inadequate discovery when the nonmoving party failed to make an appropriate motion under Rule 56([d])).  He has not invoked that rule.  Therefore, the court will consider the affidavits and additional materials submitted by the defendants and will treat the motion of the defendants as a motion for summary judgment.

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphases added).  Whether a fact is material depends upon the substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247-48.  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court must view the evidence in the light most favorable to the nonmovant and draw all justifiable inferences in his favor. *Greater Balt.*, 721 F.3d at 283.  At the same time, the court must not yield its obligation "to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (citation and internal quotation marks omitted).

**Exhaustion of Administrative Remedies**

Defendants raise the affirmative defense of non-exhaustion and assert plaintiff's claims that have not been properly presented through the administrative remedy procedure must be dismissed pursuant to 42 U.S.C. § 1997e. The Prisoner Litigation Reform Act provides, in pertinent part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

As a prisoner, plaintiff is subject to the strict requirements of this exhaustion provision. The Supreme Court has interpreted the language of this provision broadly, holding that the phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion is required even where the relief sought is not attainable through the administrative remedy procedure. *See Booth v. Churner*, 532 U.S. 731, 741 (2001). A claim that has not been exhausted may not be considered by this court. *See, e.g.*, *Jones v. Bock*, 549 U.S. 199, 219-20 (2007).

The exhaustion provision "require[s] prisoners to pursue administrative grievances until they receive a final denial of their claims, appealing through all available stages in the administrative process." *Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md. 2003). In doing so, a prisoner must pursue his grievance "'in accordance with the applicable procedural rules,' so that prison officials have been given an opportunity to address the claim administratively." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (quoting *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). But exhaustion does not require the exhaustion of administrative processes unavailable to a

prisoner. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Blake v. Ross*, 787 F.3d 693, 697 (4th Cir. 2015) (quoting *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008)).

Here, Berry failed to exhaust his claims concerning his transfer from BCDC, the alleged denial of legal visits or materials, retaliation, or the alleged harassment of his family, but may have exhausted his excessive force and First Amendment claims.

As to plaintiff's claims that he was improperly transferred from BCDC and was denied visits with his attorney, plaintiff filed ARPs with the Warden. The first concerned his transfer and was dismissed based on the assertion that plaintiff has no constitutionally protected liberty interest in his assignment to a particular prison. (*Id.* at 76.) Plaintiff also filed a separate ARP regarding ongoing problems with receiving legal visits from defense counsel. (*Id.* at 78.) The Warden's response indicated the problem was moot because plaintiff received two attorney visits on June 9, 2014, and states no further action was warranted. (*Id.*) Plaintiff never appealed the resolution of either of those ARPs. (ECF No. 23 Ex. 9 at 1.) Neither is exhausted.

As to the excessive force claim, plaintiff filed an administrative remedy procedure complaint ("ARP") regarding his altercation with Trumpower. (ECF No. 23 Ex. 6 at 75–76.) The ARP was dismissed with the following notation:

> Dismissed for procedural reasons. Pending Resubmission per DCD 185-002.VI request does not provide sufficient information to determine the basis for investigation. Resubmit your request by 6-12-14 and include the following: IIU was contacted in this case on 5-5-14.

(*Id.* at 74.) There is no indication in the record that Berry ever resubmitted his grievance, as instructed. Instead, he argues that any further review was blocked by a policy precluding recourse to the ARP process once the IIU begins investigating a complaint. *See* Maryland Department of Public Safety & Correctional Services, Division of Corrections, Administrative

Remedy Procedures DCD No. 185-003.VI.N.4 (2008).  Notably, however, the response to his ARP did not invoke that policy—which might not have precluded an appeal, *see id.* at DCD No. 185-003.VI.N.7—and did not indicate that IIU was *investigating* his case, only that it had been contacted.  In any case, the Plaintiff appealed the procedural dismissal of his ARP to the Inmate Grievance Office ("IGO"), which dismissed the appeal after Berry failed to submit certain paperwork the IGO had requested.  (ECF No. 23 Ex. 9 at 2.)  The defendants have failed to include in the record, however, the letter requesting that additional paperwork or any indication that Berry received it.  In light of this ambiguity in the record and the potential unavailability of the administrative process where the IIU is investigating a grievance, the court will review the merits of Berry's excessive force claim.

As to the First Amendment claim, plaintiff filed an ARP complaining that he was prevented from practicing his religion.  (ECF No. 23 Ex. 6 at 80-82.)  That ARP was dismissed for failure to provide sufficient information to evaluate the claim.  (*Id.* at 80.)  Plaintiff was directed to resubmit his complaint within ten days and to specify the remedy he sought.  (*Id.*)  Plaintiff resubmitted the complaint after the ten-day deadline, which was dismissed as untimely.  (*Id.* at 82.)  Plaintiff appealed that dismissal to the IGO, which dismissed the appeal, again for failure to comply with the IGO's request for certain paperwork.  (ECF No. 23 Ex. 9 at 1-2.)  As with Berry's excessive force claim, the defendants have not included in the record the letter requesting additional paperwork or confirmation that Berry received it.  Given this ambiguity, the court will review the merits of Berry's First Amendment allegations.

Accordingly, the court will consider the merits of Berry's excessive force claim and his First Amendment claim.  To the extent plaintiff alleges other claims, however, they will be dismissed as unexhausted.

**Excessive Force Claim**

The Fourteenth Amendment's "Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989)). "[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.*

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.*

Here, there is an absence of significant injury. The only injury reported by plaintiff at the time was a scratch to his back, which he states he obtained from the corner of the door. (ECF No. 23 Ex. 6 at 5.) The reports prepared by defendants Trumpower and Thomas state that plaintiff was removed from his cell for purposes of searching it and that plaintiff re-entered the cell. (*Id*. at 3-4.) The report prepared by defendant Scott does not mention plaintiff re-entering the cell after the search had started, nor does it describe plaintiff as "agitated." (*Id*. at 2.) Plaintiff's statement to a prison official indicates that when he was asked where his mail was located, he was grabbed by the handcuff chain and pulled backward out of the cell as he was directing the officers where to look. (*Id*. at 5.) Removing plaintiff from the cell during a search was a legitimate security concern justifying some amount of force. The absence of any significant injury in this case is strong evidence that the force used did not exceed that which was necessary to satisfy that concern. Defendants are thus entitled to summary judgment on the excessive force claim.

**First Amendment Claim**

"[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (quoting *Price v. Johnston*, 334 U.S. 255, 285 (1948)). With respect to the free exercise of religion, prison inmates retain a right to reasonable opportunities for free exercise of religious beliefs without concern for the possibility of punishment. *See Cruz v. Beto*, 405 U.S. 319, 322 (1972). That retained right is not unfettered. Prison restrictions that impact the free exercise of religion but are related to legitimate penological objectives do not run afoul of the constitution. *See Turner v. Safley*, 482 U.S. 78, 89 (1987). The test to determine if the restrictions are justified requires examination of whether there is a rational relation between the asserted governmental interest and the regulation in question. *Id*. In addition, this court must examine whether there are alternative means of exercising the right asserted; whether accommodation of the right will impact on the orderly operations of the prison; and whether readily available alternatives to the regulation would be less restrictive. *Id.* at 90-91.

An additional consideration in this case is the standard provided by the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). That act provides in part that

> [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling government interest; and (2) is the least restrictive means of furthering that compelling government interest.

42 U.S.C. § 2000cc-1(a) (2000). RLUIPA does not give prisoners an unfettered right to religious accommodation. Rather, the statute mandates "due deference to the experience and expertise of

prison and jail administrators . . . ." *Lovelace v. Lee*, 472 F.3d 174, 174 (4th Cir. 2006) (quoting *Cutter v. Wilkinson,* 544 U.S. 709, 723 (2005)).

Plaintiff maintains he was denied access to participation in Ramadan and to religious articles based on his status as a pretrial detainee. Defendants, however, provide a sworn declaration stating that plaintiff did not submit a timely, written request for participation, nor was there any written indication in his record that he was a practicing Sunni Muslim. (ECF No. 23 Ex. 5.) Defendant Kitchen characterizes plaintiff's response to being advised he would need to register his religious preference as belligerent and indicated that plaintiff refused to take any action to register his religious preference with prison officials. (*Id*. at 2.) Plaintiff states in his opposition that he was not belligerent, but told Kitchen he would be filing a civil action against him for depriving him of his First Amendment right. (ECF No. 25 at 9.) Plaintiff does not refute defendant Kitchen's assertion that he took no action after he was advised he was not registered as Muslim and, as a consequence, was not permitted to participate in Ramadan or possess religious articles.

Plaintiff's claim that he was denied a right to practice his faith based on his status as a pre-trial detainee finds no support in the record. Rather, plaintiff was informed that certain criteria for paperwork had not been met and he refused to cooperate with correcting the issue. Whether plaintiff filled out a religious preference card when he was transferred to RCI as he claims is of no real consequence where, as here, there is a clear indication that the needed paperwork was not in plaintiff's file. Plaintiff's refusal to provide that documentation is the legitimate reason he was not permitted to participate in services and requiring plaintiff to fill out a preference card, even if he had already filled one out previously, is reasonable under the circumstances. Defendants are entitled to summary judgment on this claim.

**Conclusion**

For the reasons stated, plaintiff will not be appointed counsel. The defendants are entitled to dismissal or summary judgment on all claims. A separate order follows.

<u>July 30, 2015</u>                                          <u>        /S/                              </u>
Date                                                                Catherine C. Blake
                                                                         United States District Judge